Mortimer M. CAPLIN, Trustee in Reorganization of Webb & Knapp, Inc., on behalf of debenture-holders under a trust indenture of Webb & Knapp, Inc. to the Marine Midland Trust Company of New York, trustee, dated as of June 1, 1954, Plaintiff-Appellant,

v.

The MARINE MIDLAND GRACE TRUST COMPANY OF NEW YORK, Defendant-Appellee.

In the Matter of WEBB & KNAPP, INC. and Subsidiaries, Debtors, Mortimer M. Caplin, Trustee in Reorganization of Webb & Knapp, Inc. and Subsidiaries, Trustee-Appellant (two cases).

In the Matter of WEBB & KNAPP, INC. and Subsidiaries, Debtors, the Marine Midland Grace Trust Company of New York, Claimant-Appellant.

No. 327, Docket 32586.

United States Court of Appeals, Second Circuit.

Argued Dec. 16, 1970.

Decided March 3, 1971.

En Banc ordered Jan. 13, 1971.

Irving R. Kaufman, Circuit Judge, dissented in part and filed opinion in which Hays, Circuit Judge, concurred.

Charles H. Miller, New York City (Marshall, Bratter, Greene, Allison & Tucker, New York City, of counsel), for Chapter X trustee-appellant and cross-appellee.

John Dickey, New York City (Sullivan & Cromwell, New York City, of counsel), for indenture trustee and cross-appellant.

Paul Gonson, Washington, D. C. (David Ferber, Sol., S. E. C.), for S. E. C.

Before LUMBARD, Chief Judge, and MOORE, FRIENDLY, SMITH, KAUFMAN, HAYS and ANDERSON, Circuit Judges.*

FRIENDLY, Circuit Judge:

We have three appeals and a cross-appeal from orders of Judge McLean concerning the reorganization of Webb & Knapp, Inc. under Chapter X of the Bankruptcy Act which is now pending in the District Court for the Southern District of New York. All relate to complaints by the Chapter X Trustee, Mortimer M. Caplin, concerning alleged failure on the part of The Marine Midland Grace Trust Company of New York ("Marine"), trustee under an Indenture whereunder Webb & Knapp issued unsecured debentures now outstanding in the amount of $4,298,200, to enforce certain covenants made by the debtor.[1]

Marine had filed a proof of claim in the sum of $51,447.55 for services rendered and expenses incurred by it as indenture trustee. The Chapter X Trustee objected to this on the ground of Marine's alleged breach of duty and counterclaimed for damages in the amount of the debentures that remained outstanding. With the authorization of the district court, he also filed a plenary suit seeking the same relief. In addition he moved that Marine be required to file an accounting. Marine moved to dismiss the objections to its proof of claim, the

---

\* Judge Feinberg took no part in the consideration or decision of this case.

1. The breach concerns mainly, if not indeed solely, Section 3.6 of the Indenture. Webb & Knapp there covenanted that so long as any of the debentures remained outstanding, it would not incur or assume indebtedness resulting from borrowings or from the purchase of real property or interests in real property on which it would be personally liable, or to purchase any real property, or interests in real property, unless on the basis of computations (made as of the last day of the fourth month prior to such transaction) its "consolidated tangible assets" would equal 200% of certain liabilities. In determining "consolidated tangible assets" the Company was authorized, *inter alia*, to rely on and use appraisals made by its officers and approved by the Board of Directors "of real property, of interests in real property * * * or of the controlling stock interest in any corporation the principal assets of which consist of real property or interests in real property." The Company was required to file a certificate of compliance annually with Marine. In addition to such certificates Marine requested, as permitted by the Indenture, and received separate officers' certificates stating specifically that Webb & Knapp was not in violation of § 3.6. In accordance with § 315 of the Trust Indenture Act of 1939, 15 U.S.C. § 77*ooo*, § 10.1 of the Indenture required Marine to examine all reports furnished to it but authorized it, in the absence of bad faith, to rely upon certificates or opinions conforming to the requirements of the Indenture. The Chapter X Trustee claims that although the reports for 1959–63 showed asset-liability ratios ranging from a high of 258.30 in 1961 to a low of 200.56 in 1963, Marine should have known that the appraised values were inflated.

counterclaim and the plenary suit. The judge held that grant of Marine's motions to dismiss the counterclaim and the complaint was required by Clarke v. Chase Nat'l Bank, 137 F.2d 797 (2 Cir. 1943), but denied its motion to dismiss the objections. He also denied the Trustee's motion to compel Marine to account since there was no allegation that Marine had mishandled any funds which came into its hands as indenture trustee, and the only claim asserted by the Chapter X Trustee was the indenture trustee's alleged failure to enforce the negative covenant, a claim that would stand no better as a counterclaim to an accounting than as a plenary action or as a counterclaim to a proof of claim. Each party appealed from the decisions adverse to it.

After a panel consisting of Judges Moore, Kaufman and Hays had come to the conclusion that Clarke should be overruled, the court voted, in accordance with its usual practice in such cases, see, e. g., Indussa Corp. v. S.S. Ranborg, 377 F.2d 200 (2 Cir. 1967), to consider the appeals in banc upon the briefs already filed. A majority of the full court have concluded that Clarke was correctly decided and, since this case is admittedly not distinguishable, that the dismissal of the counterclaim and the plenary suit should be affirmed. We are all of the view that the orders denying the Trustee's motion to require Marine to account and refusing to strike his objections to Marine's claim should be affirmed.

Clarke was an action by the Chapter X Trustee of Associated Gas and Electric Company (Ageco) against the Chase National Bank, trustee under an indenture for debenture holders. Broadly speaking the complaint contained two differing sets of counts. The first and third alleged that Chase, in breach of its duties as indenture trustee, had failed to enforce certain covenants against the mortgage or pledge of Ageco's property or its merger into another corporation and sought to recover losses suffered by the debenture holders in consequence. The second count sought recovery of $4,000,000 allegedly received by Chase from Ageco in payment of an indebtedness, though Chase knew the latter was insolvent or in imminent danger of insolvency; the fourth count alleged that Chase had received a preference in respect of $4,249,000 of Ageco debentures owned by Chase, through an unfair exchange with Ageco's subsidiaries of these debentures for securities of greater value, at a time when Chase knew Ageco was insolvent.[2] The court unanimously reversed an order dismissing the second and fourth counts. A majority, with Judge Augustus N. Hand writing for himself and Judge Chase, upheld an order of a different judge dismissing the first and third counts; as to this Judge Learned Hand dissented.

The majority in Clarke reasoned that, assuming liability, "we cannot see that the claims for breach of the covenants are any part of the property of the bankrupt or would affect the plan of reorganization"; they were rather claims "of the debenture-holders not derived from the bankrupt's estate but arising through the alleged tortious action of the indenture trustee." 137 F.2d at 800. They cited the earlier decisions in In re 1775 Broadway Corp., 79 F.2d 108 (2 Cir. 1935), that the reorganization court has no jurisdiction to force nonassenting noteholders to release claims against an indenture trustee for misrepresentation in the sale of the notes, since these were not claims against the debtor or its assets or claims that must be settled to bring property into the reorganized company, and in In re Nine North Church Street, Inc., 82 F.2d 186 (2 Cir. 1936), that the reorganization court has no jurisdiction to enjoin nonassenting certificate holders from suing the guarantor of a mortgage on the debtor's property

2. A fifth count sought to recover $40,000 that had been paid Chase as trustee's fees, which the district court had dismissed with leave to amend; the court dismissed the appeal from this order for lack of appellate jurisdiction, 137 F.2d at 801.

since the suit was to enforce a personal right against the guarantor and did not concern property subject to reorganization. Judge Learned Hand argued that the indenture trustee had a duty to prevent the violation of the covenants in the indenture, 137 F.2d at 802, which was true enough, and then asked "In what way does that [breach of duty] differ from allowing a debtor, in violation of the mortgage, to substitute improper collateral?" The answer was that in the latter case the mortgage trustee would have dealt improperly with property of the bankrupt. Judge L. Hand himself had based his opinion in Central Hanover Bank & Trust Co. v. President and Directors of Manhattan Co., 105 F.2d 130, 131–132 (2 Cir. 1939), on the ground that there the accounting dealt with property of the debtor which trustees for secured creditors had allegedly surrendered in breach of the trust, and that the rights of the creditors to compel them to restore the *res* was within the "extended" concept of the debtor's property in a reorganization.[3] He was there careful, however, to distinguish the case in which the creditors asserted rights having "nothing to do with the *res* and [which] would not restore it" and "had nothing to do with anything that had ever been the debtor's property, or with the distribution of any part of it." *Id.* at 132. This distinction, apparently lost sight of in his dissent in *Clarke,* had been further developed by Judge Frank in Brooklyn Trust Co. v. Kelby, 134 F.2d 105, 110–112, 116 (2 Cir.), cert. denied, 319 U.S. 767, 63 S.Ct. 1330, 87 L.Ed. 1717 (1943).

A year and a half after *Clarke,* a panel consisting of the three other judges of the court as it then stood, Swan, Clark and Frank, decided the complicated case of President and Directors of Manhattan Co. v. Kelby, 147 F.2d 465 (2 Cir. 1944), cert. denied, 324 U.S. 866, 65 S.

Ct. 916, 89 L.Ed. 1422 (1945). The unanimous opinion was written by Judge Frank, who had long been expert in reorganization matters and was a member of the SEC when Chapter X was adopted, in no small measure at its instance. The court took a broad view of the rights of reorganization trustees against a trustee under an indenture but stopped when it came to an issue similar to that here presented. One of the claims of the Chapter X Trustees was that the indenture trustee was liable in damages for failing to enforce a covenant of Prudence-Bonds Corporation to deposit a guarantee by the Prudence Company. Although recognizing that such damages might be considerable, the court held that "an action for those damages is not one for restoration of the [trust] fund" and "cannot be maintained in connection with the bankruptcy proceedings," 147 F.2d at 478, citing Brooklyn Trust Co. v. Kelby, *supra,* 134 F.2d at 111.

It is with this background that we come to Prudence-Bonds Corp. v. State Street Trust Co., 202 F.2d 555, 558 (2 Cir.) cert. denied, 346 U.S. 835, 74 S.Ct. 47, 98 L.Ed. 357 (1953), more particularly to Judge Learned Hand's opinion on rehearing. The Chapter X Trustee regards this as fundamentally inconsistent with *Clarke,* which the opinion did not mention. In our view the reason for failing to mention *Clarke* was that for grounds clearly stated by Judge Hand, there was no inconsistency.

The holdings in *Prudence-Bonds* with which we are concerned were (1) that the Chapter X Trustees could have maintained an action against an indenture trustee for failure to enforce a "Secondary Guaranty" by the Prudence Company of mortgages held by the indenture trustee as security for the bondholders, and (2) that this right had been conveyed to the reorganized company. Indeed it is only the first holding that is

---

3. The "extension" was that in some instances the Chapter X trustee may be able to recover property of the company which the debtor, because it might be

barred by a defense of consent or, estoppel, could not. See *McCandless v. Furlaud,* 296 U.S. 140, 159–161, 56 S.Ct. 41, 80 L.Ed. 121 (1935).

of real interest here. Its justification was thus stated, 202 F.2d at 561:

> But by the Secondary Guaranty the Guarantor became a surety for the performance of the mortgagors, just as the mortgages were a surety for the same performance. The only difference between them was that in one case the security was the promise of a third person and in the other it was a lien upon property. The promise was a part of the *res* in precisely the same sense that the promises were in the policies of fire and title insurance, mentioned in Article 1, § 2. As we have said, it was in effect the equivalent of a policy of credit insurance of the mortgagors.

The significance of this was heightened by the distinction drawn between the indenture trustee's failure to enforce the "Secondary Guaranty" and the "Primary Guaranty," i. e., a guarantee by the Prudence Company of the bonds of Prudence-Bonds themselves. While the court said it "need not answer" the question whether this "was also a part of the *res*," the opinion in effect did so when it said that this "was a promise to the bondholders to pay the Debtor's obligations, and had nothing to do with the *res*." *Id.* It was the Primary Guaranty which was like the claim sought to be pressed in *Clarke* and here.[4] Far from being indistinguishable, as the dissent claims, *Prudence-Bonds* differs from this case and from *Clarke* on the very ground Judge Hand was at such pains to clarify. If Marine had held property of Webb & Knapp through pledge or, for example, as a result of payments into a sinking fund, the Chapter X Trustee could sue under *Prudence-Bonds* for mismanagement of such assets, since he would be asserting a claim to property of the debtor which the indenture trustee had held. Here, as in *Clarke,* he is not. The difference between failure to enforce a third party's guaranty of a mortgage assigned to an indenture trustee or other property held by it as security and failure to enforce a promise by the debtor is the highly significant one that the former has diminished the debtor's estate and the latter has not.

The collapse of the argument of the Chapter X Trustee based on *Prudence-Bonds* does not, of course, mean that we could not overrule *Clarke* if we were convinced that Judges Augustus Hand and Chase had been in error. But we are not.

It is necessary in the first instance to consider what effect a recovery by the Chapter X Trustee would have on the reorganization. On a superficial view this might seem substantial—if, for example, the Chapter X Trustee were to achieve a complete recovery, the debenture holders would be paid off and it might seem there would be that much more for the other creditors and the stockholders. But this pleasant prospect speedily evaporates when the law of subrogation is brought into play. As a result of subrogation, Marine would simply be substituted for the debenture holders as the claimant. Cf. ALI, Restatement of Security § 141 (1941). If the Chapter X Trustee recovered judgment in a lesser amount, the claim of the debenture holders would still be provable in full, with the division of the proceeds between them and Marine dependent upon the results of the reorganization, and other creditors or stockholders would not be affected. Indeed, even these hypotheticals put the case too favorably for the Chapter X Trustee, since we do not see the answer to Judge A. N. Hand's observation in *Clarke, supra,* 137 F.2d at 800.

---

4. We do not regard In re Solar Mfg. Corp., 200 F.2d 327 (3 Cir. 1952), cert. denied sub nom. Marine Midland Trust Co. v. McGirl, 345 U.S. 940, 73 S.Ct. 831, 97 L.Ed. 1366 (1953), as in conflict with *Clarke.* Although we would not be persuaded by the procedural distinction made at p. 332 n. 6, the counterclaim against the Indenture trustee there sustained was for failure to earmark $450,000 it had received upon the sale of certain of the debtor's property. Since the claim was for failure to keep funds of the debtor which the indenture trustee was bound to hold in trust, the court concluded that the cause of action was "quasi in rem for the benefit of the trust" and "for the restoration of trust funds." *Id.* at 332.

Each creditor, including the debenture-holders, can prove the full amount of his claim, and only to the extent that a debenture-holder fails to satisfy it from the bankruptcy estate will he suffer a loss which he can assert against the defendant through its failure to enforce the negative covenants.

The claim against Marine thus could not be prosecuted to judgment until the results of the reorganization become known.[5]

Equally important to the *Clarke* decision was the necessity, 137 F.2d at 801, under F.R.Civ.P. 17(a), here applicable by virtue of General Order in Bankruptcy 37, that "Every action shall be prosecuted in the name of the real party in interest." To determine whether Caplin has that status, we look to the Bankruptcy Act.

Sections 186 and 187 provide that a Chapter X Trustee "shall be vested with the same rights, be subject to the same duties, and exercise the same powers as a trustee appointed under section 44 of this Act, and, if authorized by the judge, shall have and may exercise such additional rights and powers as a receiver in equity would have if appointed by a court of the United States for the property of the debtor." Section 70, sub. a vests a trustee appointed under § 44 "with the title of the bankrupt" to eight types of property therein described. None of these, by the remotest stretch of language or even of imagination, could include the claims of debenture holders against an indenture trustee for permitting the debtor to violate covenants made by the debtor to the indenture trustee for the bondholders' protection. The bankruptcy trustee's task is to "collect and reduce to money the property of the estates for which they are trustees," § 47.

While the reorganization trustee's added duty, § 167(3), to "report to the judge any facts ascertained by him pertaining to fraud, misconduct, mismanagement and irregularities, and to any causes of action available to the estate," may be broad enough to authorize him to report whether in his opinion an indenture trustee has failed in its duties to debenture holders and this may assist the latter in asserting their rights, nothing in the statute allows him to collect any moneys or other property not owed to or owned by the estate although, as indicated, see fn. 3, he may sometimes be able to recover an insolvent corporation's property when the corporation itself might be subject to a defense of consent or estoppel.

Any other view would, for example, allow a Chapter X Trustee to settle claims of debenture holders against third parties with the approval of the reorganization court, and would, in principle, sanction a plan of reorganization providing for a partial or even total release of such claims. Yet § 216(2) says that the plan "may deal with all or any part *of the property of the debtor*" (emphasis supplied) and § 216(13) directs that it "may include provisions for settlement or adjustment of *claims belonging to the debtor or to the estate*" (emphasis supplied). The debenture holders' claims against Marine simply do not fit under those rubrics.

The Reorganization Trustee relies heavily on statements from the legislative history of Chapter X, such as that in the House Report, H.R.Rep. 1409, 75th Cong., 1st Sess., pp. 43–44 (1937), that "There must be power and responsibility in the hands of a qualified representative of investors." It was exactly in this spirit that Chapter X was read in its

---

5. Caplin argues that failure to allow suit by him would leave the debenture holders without remedy against Marine as a practical matter, since under Elkind v. Chase Nat'l Bank, 259 App.Div. 661, 20 N.Y.S.2d 213 (1st Dept.), aff'd 284 N.Y. 726, 31 N.E.2d 198 (1940), each would have to sue individually. Apart from other possibilities under F.R.Civ.P. 23, we would not regard it as unlikely that a class action could be maintained in federal court for violation of § 315 of the Trust Indenture Act of 1939, although, of course, we are not to be understood as so deciding.

early years by the judges who sat on this court in the 1940's, one of whom, as noted, had played no small role in its enactment. These were not judges who read statutes in the niggling way condemned by Mr. Justice Holmes, "We see what you are driving at, but you have not said it, and therefore we shall go on as before." Johnson v. United States, 163 F. 30, 32 (1 Cir. 1908). But they could find nothing in Chapter X, as we cannot, to indicate that Congress was "driving at" allowing a trustee to enforce claims not belonging to the estate. Now that the issue has again been raised after so many years, Congress may wish to consider whether it is possible and, if so, desirable to go further and permit the trustee to enforce individual claims of security holders against third parties.[6] That is a policy decision to be made by the legislature, not by our overruling soundly reasoned decisions of our distinguished predecessors, who knew the statute every bit as well as we do and construed it to mean what it rather clearly says. We therefore affirm Judge McLean's dismissal of the Chapter X Trustee's counterclaim and plenary suit.

■ We are all in accord with the decision of the panel to affirm the district court's denial of the Trustee's motion for an accounting. Although § 212 gives the reorganization court power to enforce an accounting under instruments whereby any one of a number of persons, including an indenture trustee, "purports to represent any creditor or stockholder," this does not authorize the court to require an "accounting" by an indenture trustee when there is no claim that he holds property belonging to the debtor or any security holder, or has mishandled any such property in the past.

■ We likewise are in accord with the panel's decision affirming the denial of Marine's motion to strike the Chapter X Trustee's objections to its proof of claim. Marine claims it is entitled to be paid its pro-rata share out of the debtor's property for services it rendered as the indenture trustee, whereas Caplin contends it did not perform the services it should have performed. We cannot say that the objection, if well founded in fact, would not be valid in law. As already indicated, even though the debtor corporation here might have been estopped to assert failure of consideration as a defense to the trustee's claim, as Marine argues, it does not follow that the reorganization trustee may not do so.[7]

The orders of the district court are affirmed. No costs.

IRVING R. KAUFMAN, Circuit Judge (with whom HAYS, Circuit Judge, concurs), dissenting in part:

I see no justification for continued adherence to the long since eroded rule announced over Judge Learned Hand's vigorous dissent in Clarke v. Chase Nat'l Bank, 137 F.2d 797 (2 Cir. 1943). I

6. An affirmative answer should not simply be assumed. Apart from possible question whether the bankruptcy power extends to claims of creditors against solvent third parties, which Congress might not think it worthwhile to raise, there would be serious problems if other states have rules like that prevailing in New York before 1950 that transfer of a bond does not carry accrued claims against trustees or guarantors, see Elkind v. Chase Nat'l Bank, supra, 259 App.Div. 661, 20 N.Y.S.2d 213, overruled in part by statute, L.1950, c. 812, N.Y. Personal Property Law § 41, subd. 4, contrast, Welch v. Northern Bank & Trust Co., 100 Wash. 349, 170 P. 1029 (1918), or when such claims had been reserved by agreement. With no showing that the Clarke decision had caused any real difficulty over the past twenty-seven years, Congress might well decide that it was best to adhere to the policy of allowing holders of the bonds of debtors in reorganization to pursue their own remedies against third parties.

7. We need not consider whether a determination of the objection in favor of the Chapter X Trustee might enure to the benefit of the debenture holders in an action by them under the principle of Zdanok v. Glidden Co., 327 F.2d 944 (2 Cir.), cert. denied, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964).

would permit Caplin to assert his counter-claim and maintain the plenary action.

Indeed, Judge Hand himself in effect announced the demise of the *Clarke* rule in Prudence-Bonds Corp. v. State Street Trust Co., 202 F.2d 555 (2d Cir. 1953), without saying so expressly. The plaintiff in *Prudence-Bonds*, like Caplin, sought redress on behalf of bondholders for the alleged default by the trustee of a bond indenture. The reorganized corporation, successor to the reorganization trustee and proceeding pursuant to an order of the bankruptcy court, alleged that the indenture trustee had negligently failed to demand payment by a guarantor of a mortgage pledged to the indenture trustee as security for the bonds, following the mortgagee's default. Although at the time of the default and for a period thereafter the guarantor was solvent and presumably could have made good on its guarantee, the guarantor's insolvency followed close upon that of the debtor. Learned Hand, joined by Chief Judge Swan and Judge Frank, found that the broad authority of the reorganization court to implement a reorganization plan furnished ample authority for the newly reorganized corporation to assert before the bankruptcy court the liability of the indenture trustee "to the bondholders for any loss that resulted" from that trustee's alleged breach. *See* 11 U.S.C. §§ 621–629.

In its brief on appeal, Marine attempted to distinguish *Prudence-Bonds* in several respects, but each is inconsequential. The relevance of the assertion that Marine successfully opposed Caplin's application for an accounting by Marine or that Marine is not now seeking a release as trustee, escapes me altogether. Such considerations would seem to bear more on jurisdiction than standing. And the claim that the bondholders' interests here are unsecured, unlike those in *Prudence-Bonds*, is also of no moment. Moreover, I would not attribute to Congress the perverse purpose of permitting a bankruptcy court to authorize a corporation already reorganized to assert bondhold-

ers' claims against the indenture trustee, as in *Prudence-Bonds*, while denying it the power to dispose of those claims in more orderly fashion by permitting the trustee to raise them *before* the reorganization plan has jelled.

The majority concedes that *Prudence-Bonds* is indistinguishable in any of these respects, but suggests that it may be explained away on yet another ground. The opinion tells us that a Chapter X trustee may proceed against an indenture trustee for failure to enforce a guaranty *by a third party* that secures the trust res, as in *Prudence-Bonds*, but not for failure to enforce a promise *by the debtor himself* contained in the trust indenture, as here, which also protects and secures the trust res. This anomalous result is said to be forced upon us because of language in Learned Hand's *Prudence-Bonds* opinion having nothing to do with that court's discussion of the standing problem.

But when a hypothesis as to a law's meaning is seen to yield such awkward conclusions, it is perhaps better to re-examine the hypothesis than to ascribe to Congress an intent to fashion so irrational a design. In this instance, the pressure to ascribe such an intent is very slight indeed. For in purporting to set forth the reasoning of the *Prudence-Bonds* court with respect to the standing problem, 202 F.2d 555 at 560, the majority relies entirely on dictum which occurs in the court's later analysis of the merits of the successor corporation's action against the trustee. 202 F.2d at 561. The finding of standing in *Prudence-Bonds* is not premised at all on this dictum, but rather "of the broad implementary powers of a judge when a plan is confirmed" and specifically on an order of the reorganization court permitting the new corporation to pursue *"any* objections" (emphasis added) to the indenture trustee's accounts "on its own behalf and on behalf of" the bondholders. There is no basis in the *Prudence-Bonds* opinion for limiting this language, which clearly would comprehend such an action as Caplin's, by transposing into

the court's discussion of standing later dictum intended to bear—and even then incidentally and by way of speculation and musing—only on the merits of the new corporation's action, and not on its right to bring it.

In distinguishing *Prudence-Bonds* the majority is compelled to rely on dictum in the opinion irrelevant to the question presently before this court. But, we can understand this, for otherwise the majority would be required to show in detail why there should have been standing in *Prudence-Bonds* under the rationales that it advances to support its decision today. My brothers rightly conclude, and no one has asserted otherwise, that Caplin's claim against Marine could not "by the remotest stretch of language or even of imagination" be considered an action to "collect and reduce to money the property of the [estate] for which" Caplin is trustee, citing Section 47 of the Bankruptcy Act. But it requires no lesser feat of linguistic gyration to conclude that the action in *Prudence-Bonds* was such an action. The action in *Prudence-Bonds* was one for an accounting for the loss to the bondholders, on behalf of the bondholders alone, that resulted from the indenture trustee's breach of a negative covenant, as here. It was not in any sense an action for restoration of the trust fund or the debtor's property (unless Caplin's action may also be so described). Indeed Judge L. Hand specifically observed that "the breach was at most a failure properly to protect a part of the *res*"—which is precisely the situation here—"and not a 'surrender or release'" of the res. 202 F.2d at 559.

This is not the end of the majority's difficulties with *Prudence-Bonds*. My brothers go to great lengths to show—wrongly, I believe—that "other creditors or stockholders would not be affected" by Caplin's action in this case. But the reorganization in *Prudence-Bonds* had already been effected and was not likely to be altered retrospectively. Even had the suit been brought before a plan had been approved, the recovery would have inured to the benefit of no one but the bondholders, as is the case here.

There is a more fundamental answer, however, to the argument that only one class of creditors will be affected if Caplin recovers. Although the bondholders' recovery will swell directly only the purses of the bondholders, the majority ignores the central consideration that certainty as to the bondholders' rights against the indenture trustee cannot fail to affect the views of the interested parties and the court in passing on the fairness of the reorganization plan. 11 U.S.C. § 621(2). The majority thus seems to misconstrue the true scope and nature of a reorganization proceeding. The process of reorganizing is not performed merely by a nice, sharp, precise and mathematical apportionment of a debtor's estate according to fixed formulas. Rather, the objective is carried out through a process of negotiation, and some give-and-take, in an attempt to adjust equitably and with sensitivity to the nuances of the individual case the rights of competing interested parties. As Judge L. Hand argued persuasively in dissenting from the decision in *Clarke*, the reorganization court has jurisdiction over a case such as this as part of its obligation to "adjust the mutual rights of the debtor's creditors as between themselves." 137 F.2d at 802. I see no reason for denying to the reorganization court, as the majority does, the power to discharge this obligation here or properly to perform its duty to adjudge the equitableness of a proposed reorganization plan.

This latter consideration is particularly relevant to this case, where it appears that the indenture trustee may be implicated in the causes for Webb & Knapp's bankruptcy. As Judge Hand put it, "the trustee should have prevented the debtor from siphoning its assets away from its creditors—the bondholders along with the other general creditors. * * * The loss was * * * of the debtor's assets; the remedy will be in their restoration; I do not under-

stand how that can be alien to a reorganization." 137 F.2d at 802.

Thus, the parade of horribles which my brothers assert would follow if Caplin were allowed to bring this claim—including virtually the confiscation of property of parties with no semblance of due process—is a phantasm. We are concerned here only with the standing of a trustee in reorganization to *assert* the claims of creditors, not to *cancel* them, where the reorganization trustee asserts that creditors have been damaged along with all other parties to the reorganization by the indenture trustee's negligent failure to protect the debtor's assets. It is a very narrow proposition that the majority rejects, not an infinitely expandable one. By rejecting it, the majority retreats from this court's previously declared commitment to the flexible approach announced in *Prudence-Bonds*.

Moreover, the view of the majority appears significantly narrower than that of the *Clarke* majority. That court was unwilling to constrict itself to the narrow "property" analysis advanced by the majority, but suggested instead that the indenture trustee might have standing if "the claims for breach of the covenants [were] any part of the property of the bankrupt *or* would affect the plan of reorganization." (Emphasis added.) 137 F.2d at 800. Immediately following this sentence, the *Clarke* court launched upon an extended discussion of the question whether the claim would affect the plan after which it appended, almost as an afterthought, the observation that "Moreover the trustee * * * has no title to the claims embraced in the first and third counts * * *." Although I believe that the *Clarke* majority was in error to hold that the claim would not affect the plan, its analysis was considerably broader than that adopted by my brothers.

Finally, the result today ill serves two reforms central to the scheme of the Chandler Act: to promote the collection and dissemination of all information relevant to the debtor and its affairs and to involve the Securities and Exchange Commission in complex reorganization proceedings as an advisor or friend of the court, a role it has assumed as a party to this appeal, in urging us to permit Caplin to pursue his claims. See H. Report No. 1409 on H.R. 8046, 75th Cong., 1st Sess., pp. 47–48 (1937).

The reorganization trustee is empowered to undertake a comprehensive investigation into the history and financial condition of the debtor by 11 U.S.C. § 567. To compel the bondholders in these circumstances to proceed individually or in a separate class action, would only give rise to a massive redundancy of fact-finding. To restate the point somewhat more positively, a fair adjudication of the issue between the bondholders and Marine will be promoted if the information available to the trustee is efficiently brought to bear in that dispute and revealed to the court.[1]

Scrutiny or active participation by the SEC is provided for by numerous provisions of Chapter X (11 U.S.C. §§ 561, 567(5), 571–574, 590, 608 622). On few issues is that agency's expertise more relevant than in a case such as this, involving the adjudication of rights and duties of a trustee functioning under the Trust Indenture Act of 1939, 15 U.S.C. § 77aaa et seq. This expertise will be available in a reorganization proceeding but ordinarily not in individual or class action bondholders' suits.

In short, today's decision not only retreats from past precedent but is contrary to the purposes which motivated Congress to enact the Chandler Act.

---

[1]. The manifest inconvenience of the *Clarke* rule is magnified in a case where, as here, the indenture trustee filed a claim against the estate of the debtor for his services as trustee. A determination of the merits of Caplin's plenary action and counterclaim will not require the bankruptcy court to investigate any matters that it would not have to pass upon in adjudicating Caplin's objection to Marine's claim.